1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   EDWARD D. VOGEL, Cal. Bar No. 110081
3  evogel@shepparmullin.com
   MARK G. RACKERS, Cal. Bar No. 254242
4  mrackers@sheppardmullin.com
   501 West Broadway, 19th Floor
5  San Diego, California  92101-3598
   Telephone:  619-338-6500
6  Facsimile:  619-234-3815

7  Attorneys for Defendant
   WELLS FARGO BANK, N.A. d.b.a.
8  AMERICA'S SERVICING COMPANY

9

F I L E D

09 JUL -7 PM 3:27

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

10              UNITED STATES DISTRICT COURT

11              SOUTHERN DISTRICT OF CALIFORNIA

12

'09 CV 1470 DMS NLS

13

14  ELIZABETH A. HURREY-MAYER,          Case No.
    an individual,
15                                      **DEFENDANT WELLS FARGO
                    Plaintiff,          BANK, N.A. d.b.a. AMERICA'S
16                                      SERVICING COMPANY'S NOTICE
          v.                            OF REMOVAL**
17
    WELLS FARGO HOME
18  MORTGAGE, INC. d.b.a. AMERICA'S
    SERVICING COMPANY, a
19  corporation; and DOES 1 through 10
    inclusive,
20
                    Defendants.
21

22

23

24

25

26

27

28                                          **ORIGINAL**

-1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Defendant Wells Fargo Bank, N.A. d.b.a. America's Servicing Company ("Wells Fargo"), erroneously named as Wells Fargo Home Mortgage, Inc. d.b.a. America's Servicing Company, provides notice that pursuant to 28 U.S.C. §§ 1441 and 1446, Wells Fargo hereby removes to this Court the state court action styled as *Elizabeth A. Hurrey-Mayer v. Wells Fargo Home Mortgage, Inc. d.b.a. America's Servicing Company, et al.*, San Diego County Superior Court Case Number 37-2009-00090985-CU-OR-CTL.

The following is a listing of the pleadings to date and a short and plain statement of the grounds for removal:

**I.**

**THE STATE COMPLAINT**

1.      On June 4, 2009, Plaintiff Elizabeth A. Hurrey-Mayer ("Plaintiff") filed a complaint against Wells Fargo in California Superior Court for the County of San Diego, Superior Court Case Number 37-2009-00090985-CU-OR-CTL.  A copy of the entire case file is attached hereto as Exhibit A.

2.      The first date upon which Wells Fargo received a copy of the complaint was June 12, 2009, when it was served with a copy of the complaint and a summons from the state court.  A copy of the summons is included with the complaint as Exhibit A.

-2-

## II.

## THIS COURT HAS FEDERAL QUESTION JURISDICTION

This Court has original jurisdiction over this case because federal question jurisdiction exists under 28 U.S.C. § 1331, in that:

3.     Plaintiff asserts claims for relief pursuant to the Telephone Consumer Protection Act ("TCPA"), codified under 47 U.S.C. § 227(b)(1)(A)(iii) (*see* Complaint, Fourth Cause of Action ¶¶ 55-57); as well as for breach of an alleged Servicer Participation Agreement, pursuant to the federal "Home Affordable Modification Program" or "HAMP." Complaint, ¶¶ 17-29; 39-43.

## III.

## THIS COURT HAS DIVERSITY JURISDICTION

Because Plaintiff is a citizen of California and none of the Defendants are citizens of California, and because the amount in controversy exceeds $75,000.00, this Court also has original jurisdiction over this action under 28 U.S.C. § 1332.

**Complete Diversity Of Citizenship Exists.**

4.     For purposes of determining diversity jurisdiction, Plaintiff is a citizen of California (residing at 10009 Anoel Court, Spring Valley, California, 91977.)

5.     Plaintiff erroneously alleges that Wells Fargo Home Mortgage, Inc. d.b.a. America's Servicing Company is operating as an Iowa corporation. *See*

-3-

1  Complaint, ¶ 4.  America's Servicing company is a d.b.a. for Wells Fargo Bank,

2  N.A.  Wells Fargo Home Mortgage is not a separate corporation, but is instead a

3  division of Wells Fargo Bank, N.A.  Wells Fargo Bank, N.A., for the purposes of

4  determining jurisdiction, is "located" in South Dakota.  *See* 28 U.S.C. § 1348;

5  *Wachovia Bank v. Schmidt*, 546 U.S. 303, 306-07 (2006); Declaration of Mark G.

6  Rackers, at ¶¶ 2-4; Exhibits A, B & C attached thereto.

7

8  **The Amount In Controversy Exceeds $75,000.00.**

9

10  6.  This lawsuit arises out of two loans obtained by Plaintiff on or

11  about June 15, 2005 in the principal amounts of $412,000 and $103,000 (totaling

12  $515,000), secured by two Deeds of Trust on Plaintiff's Property.  *See* Complaint,

13  ¶ 12; Rackers Decl., ¶ 5, Exhibits D & E attached thereto.  Plaintiff alleges that

14  Wells Fargo entered into a Servicer Participation Agreement (the "Contract") with

15  Fannie Mae which dictates specific terms regarding Plaintiff's loans, including

16  requirements for modifications and default.  *See* Complaint, ¶¶ 18-23; Exhibit 1

17  attached thereto.  Plaintiff alleges that she is a third party beneficiary to the

18  Contract.  *Id.* at ¶ 39.  Plaintiff further alleges that Wells Fargo breached the

19  Contract.  *Id.* at ¶ 40.  In addition to seeking actual damages, Plaintiff seeks

20  statutory and punitive damages.  *Id.* at p. 9:9-13.  Accordingly, Wells Fargo is

21  informed and believes that the amount in controversy in this civil action is well in

22  excess of $75,000.00, exclusive of interest and costs.

23

24  7.  The citizenship of DOE defendants suing and being sued under

25  fictitious names is disregarded for purposes of diversity jurisdiction.  See 28 U.S.C.

26  § 1441(a).

27

28

-4-

NOTICE OF REMOVAL

## IV.

## **THE NOTICE OF REMOVAL IS PROCEDURALLY CORRECT**

8.     Pursuant to 28 U.S.C. § 1446(a), Wells Fargo is filing this Notice of Removal in the United States District Court for the Southern District of California, located in San Diego.  Because the state court action is pending in the California Superior Court for San Diego County, this is the proper district and division for removal.

9.     Pursuant to 28 U.S.C. § 1446(b) and Federal Rules of Civil Procedure 6 and 81(c), Wells Fargo is filing this Notice of Removal within the time permitted for removal of complaints.

## V.

## **CONCLUSION**

For these reasons, Wells Fargo respectfully requests that this Court proceed with this matter as if the Complaint had been originally filed in the United States District Court for the Southern District of California.

Dated:  July 7, 2009

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
EDWARD D. VOGEL
MARK G. RACKERS

Attorneys for Defendant
WELLS FARGO BANK, N.A. d.b.a.
AMERICA'S SERVICING COMPANY

-5-

**EXHIBIT A**

1  Octavio Cardona-Loya II, Esq. (SBN 255309)
2  Law Offices of Eric F. Fagan
3  2300 Boswell Rd. Suite 211
   Chula Vista, CA  91914
4  vito@efaganlaw.com
5  T: 619-656-6656 / F: 775-898-5471
   Attorney for Plaintiff Elizabeth A. Hurrey-Mayer
6
7
8                 **SUPERIOR COURT OF CALIFORNIA**
9              **SAN DIEGO COUNTY, CENTRAL DIVISION**

10  ELIZABETH A. HURREY-MAYER, an        )  Case No.: 37-2009-00090985-CU-OR-
11  individual,                          )  CTL
                                         )
12              Plaintiff,               )  **Plaintiff's Notice of Hearing for an**
13                                       )  **Order to Show Cause Re: Preliminary**
14  v.                                   )  **Injunction**
                                         )
15  WELLS FARGO HOME MORTGAGE, INC. )     Date: July 10, 2009
16  d.b.a. AMERICA'S SERVICING           )  Time: 8:30 a.m.
17  COMPANY, a corporation;  and DOES 1  )  Dept.: C-65
    through 10 inclusive,                )
18                                       )  The Hon. Joan M. Lewis
              Defendants.                )
19                                       )
                                         )
20  _____ )
21
22      TO DEFENDANTS: PLEASE TAKE NOTICE that on July 10, 2009, at 8:30 a.m., in
23  Department C-65 of the San Diego Superior Court located at 330 W. Broadway, San Diego,
24  CA 92101, the Honorable Joan M. Lewis, Judge presiding set for hearing an Order to Show
    Cause why a Preliminary Injunction Should Not be Granted.
25
26
27  Date: 6/11/2009
28
                                         Octavio Cardona-Loya II,
                                         Attorney for Plaintiff

EX. A 6

## PROOF OF SERVICE

<u>Hurrey-Mayer v Wells Fargo Home Mortgage</u>
SDSC Cen. County, Case No. 37-2009-00090985-CU-OR-CTL

I, Dorian Hudson, declare,

I am citizen of the United States and employed in San Diego County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2300 Boswell Rd Ste 211, Chula Vista, CA 91914.  On June 11, 2009 I served a copy of the within document(s):

**Plaintiff's Notice of Hearing for an Order to Show Cause Re: Preliminary Injunction**

**By United States mail.** I enclosed the documents in a sealed envelope to the persons at the address listed below:

Placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepared.

I am resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Chula Vista, California.

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE
C/O Wells Fargo Home Mortgage, Inc d.b.a. America's Servicing Company
2730 GATEWAY OAKS DR STE 100
SACRAMENTO, CA 95833

EX. A 7

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 11, 2009, at Chula Vista, California.

Dorian Hudson

PROOF OF SERVICE

EX. A 8



062S0005586284

$0.440
US POSTAGE
FIRST-CLASS
FROM 91915
JUN 11 2009
stamps.com



LAW OFFICES OF ERIC F. FAGAN
2300 BOSWELL RD, SUITE 211
CHULA VISTA, CA 91914

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN
CALIFORNIA AS CSC - LAWYERS INCORPOR
C/O Wells Fargo Home Mortgage, Inc d.b.a. America'
End
2730 Gateway Oaks Dr Ste 100
SACRAMENTO CA 95833-3503

EX. A 9



**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED

SUPERIOR COURT OF JUSTICE 13
CENTRAL DIVISION

2009 JUN -4  A 8: 52

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
WELLS FARGO HOME MORTGAGE, INC. d.b.a. AMERICA'S
SERVICING COMPANY, a corporation; and DOES 1 through 10
inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ELIZABETH A. HURREY-MAYER, an individual,

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA
SAN DIEGO COUNTY, CENTRAL DIVISION
330 W. Broadway, San Diego, CA 92101

CASE NUMBER
*(Número del Caso):* 2009-00090985-CU-OR-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Octavio Cardona-Loya II, Esq. SBN 255309; vito@efaganlaw.com; Phone: 619-656-6656, Fax: 775-898-5471
Law Offices of Eric F. Fagan, 2300 Boswell Rd. Suite 211, Chula Vista, CA 91914

DATE: **JUN 0 4 2009**
*(Fecha)*                                   Clerk, by **D. JOHNSON** , Deputy
                                            *(Secretario)*                          *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Wells Fargo Home Mortgage, INC. D.B.A. America's Servicing Company, A Corporation

under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

EX. A 10

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2009-00090985-CU-OR-CTL     CASE TITLE: Hurrey-Mayer vs. Wells Fargo Home Mortgage, Inc.

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non- binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court Local Rules Division II Chapter 3 and Code of Civil Procedure 1141 et seq. address this program specifically.

EX. A 11



**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.



SDSC CIV-730 (Rev 12-06)

EX. A 12

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |

| PLAINTIFF(S): Elizabeth A Hurrey-Mayer |
|---|
| DEFENDANT(S): Wells Fargo Home Mortgage, Inc. DBA America's Servicing Company |
| SHORT TITLE: HURREY-MAYER VS. WELLS FARGO HOME MORTGAGE, INC. |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221) | CASE NUMBER: 37-2009-00090985-CU-OR-CTL |
|---|---|

Judge: Joan M. Lewis                                        Department: C-65

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

- ☐ Court-Referred Mediation Program
- ☐ Private Neutral Evaluation
- ☐ Private Mini-Trial
- ☐ Private Summary Jury Trial
- ☐ Private Settlement Conference with Private Neutral
- ☐ Other (specify): _____

- ☐ Court-Ordered Nonbinding Arbitration
- ☐ Court-Ordered Binding Arbitration (Stipulated)
- ☐ Private Reference to General Referee
- ☐ Private Reference to Judge
- ☐ Private Binding Arbitration

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate: (mediation & arbitration only) _____

Date: _____            Date: _____

_____            _____
Name of Plaintiff                                Name of Defendant

_____            _____
Signature                                        Signature

_____            _____
Name of Plaintiff's Attorney                    Name of Defendant's Attorney

_____            _____
Signature                                        Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 06/04/2009

_____
JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 01-07)         **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**         Page: 1

3

EX. A 13

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** (Name, State Bar number, and address):<br>─ Octavio Cardona-Loya II, Esq. SBN 255309<br>Law Offices of Eric F. Fagan<br>2300 Boswell Rd. Suite 211<br>Chula Vista, CA 91914<br>**TELEPHONE NO :** 619-656-6656   **FAX NO :** 775-898-5471<br>**ATTORNEY FOR** (Name): Plaintiff ELIZABETH A. HURREY-MAYER | FILED<br>CIVIL BUSINESS OFFICE-13<br>CENTRAL DIVISION<br>*FOR COURT USE ONLY*<br><br>2009 JUN -4  A 8: 52<br><br>SUPERIOR COURT<br>SAN DIEGO COUNTY, CA |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**  SAN DIEGO
**STREET ADDRESS:** 330 W. Broadway, San Diego, CA 92101
**MAILING ADDRESS:**
**CITY AND ZIP CODE:** San Diego, CA 92101
**BRANCH NAME:** CENTRAL DIVISION

**CASE NAME:**
HURREY-MAYER v WELLS FARGO HOME MORTGAGE, INC.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | | **CASE NUMBER:** 37-2009-00090985-CU-OR-CTL |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | **JUDGE:**<br><br>**DEPT:** |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [✓] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a.[✓] monetary   b.[✓] nonmonetary; declaratory or injunctive relief   c.[✓] punitive
4. Number of causes of action (specify):  5
5. This case [ ] is  [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. (You may use form CM-015.)

Date: June 3, 2009

Octavio Cardona-Loya II
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov<br><br>American LegalNet, Inc.<br>www.FormsWorkflow.com |

EX. A 14



CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability *(e.g., slip
    and fall)*
  Intentional Bodily Injury/WD
    *(e.g., assault, vandalism)*
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights *(e.g., discrimination,
  false arrest) (not civil
  harassment)* (08)
Defamation *(e.g., slander, libel)*
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
      or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections *(e.g., money owed, open
  book accounts)* (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property *(e.g., quiet title)* (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

EX. A 15



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:     330 West Broadway
MAILING ADDRESS:    330 West Broadway
CITY AND ZIP CODE:   San Diego, CA 92101
BRANCH NAME:        Central
TELEPHONE NUMBER:   (619) 450-7065

PLAINTIFF(S) / PETITIONER(S):     Elizabeth A Hurrey-Mayer

DEFENDANT(S) / RESPONDENT(S):  Wells Fargo Home Mortgage, Inc.

HURREY-MAYER VS. WELLS FARGO HOME MORTGAGE, INC.

| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2009-00090985-CU-OR-CTL |
|---|---|

Judge:  Joan M. Lewis                                          Department:  C-65

**COMPLAINT/PETITION FILED:** 06/04/2009

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.



**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

EX. A 16

Octavio Cardona-Loya II, Esq. SBN 255309
Law Offices of Eric F. Fagan
2300 Boswell Rd. Suite 211
Chula Vista, CA  91914
vito@efaganlaw.com
Phone: 619-656-6656; Fax: 775-898-5471
Attorney for Plaintiff ELIZABETH A. HURREY-MAYER

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2009 JUN -4  A 8: 52

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

## SUPERIOR COURT OF CALIFORNIA
## SAN DIEGO COUNTY, CENTRAL DIVISION

ELIZABETH A. HURREY-MAYER, an
individual,

       Plaintiff,

v.

WELLS FARGO HOME MORTGAGE, INC.
d.b.a. AMERICA'S SERVICING COMPANY,
a corporation;  and DOES 1 through 10
inclusive,

       Defendants.

) Civil Case No. 37-2009-00090985-CU-OR-CTL
)
) **COMPLAINT FOR DAMAGES:**
)  **1) Breach of Written Contract,**
)  **2) Violation of Rosenthal Act,**
)  **3) Invasion of Privacy,**
)  **4) Violation of TCPA, and**
)  **5) Unlawful and Unfair Acts and**
)     **Practices.**
)
)
)
)
)
)

## I. INTRODUCTION

1.    Plaintiff became ensnared in a loan of the kind addressed by Congress in enacting emergency legislation to halt the economic down spiral caused by an influx of what Federal Reserve Board Chairman Ben Bernanke terms "preventable foreclosures."[1]

////

////

---

[1] Ben S. Bernanke, March 4, 2008.  Full text available at www.federalreserve.gov/newsevents/speech/bernanke20080304a.htm

1
COMPLAINT FOR DAMAGES

EX. A 17



## II. VENUE

2.    Venue in this District is proper in that the Plaintiff resides here, Defendants transact business here, and the conduct complained of occurred here.

## III. PARTIES

3.    Plaintiff at all times relevant resided at 10009 Anoel Court, Spring Valley CA 91977 ("Plaintiff's Home").

4.    **WELLS FARGO HOME MORTGAGE, INC. d.b.a. AMERICA'S SERVICING COMPANY ("WELLS")** at all times relevant was a corporation doing business in San Diego County, California operating from an address at PO Box 10388, Des Moines IA 50306-0388.

5.    **DOE 1** is the present beneficiary of Plaintiffs' loan.

6.    The true names and capacities, whether individual, corporate (including officers and directors thereof), associates or otherwise of Defendants sued herein as DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sue these Defendants by such fictitious names. Plaintiff is informed and believes, and alleges that each Defendant designated as a DOE is involved in or is in some manner responsible as a principal, beneficiary, agent, dual agent, co-conspirator, joint venturer, alter ego, third party beneficiary, or otherwise, for the agreements, transactions, events and/or acts hereinafter described, and thereby proximately caused injuries and damages to Plaintiff. Plaintiff requests that when the true names and capacities of these DOE Defendants are ascertained, they may be inserted in all subsequent proceedings, and that this action may proceed against them under their true names.

7.    Plaintiff is a "debtor" as defined by the Rosenthal Act, California Civil Code 1788.2(h).

8.    WELLS at all times relevant was engaged in the collection of debts from consumers using the mail and telephone.

////



9.      WELLS regularly attempts to collect consumer debts alleged to be due to another.

10.     WELLS is "a debt collector" as defined by the Rosenthal Act, California Civil Code 1788.2(c).

11.     The purported debt which WELLS attempts to collect from Plaintiff is a "consumer debt" as defined by the Rosenthal Act, California Civil Code §1788.2(f).

## IV.  FACTUAL ALLEGATIONS

12.     Plaintiff Elizabeth Mayer purchased her home in June 2005 where she lives with her husband Stephen Mayer.

13.     Plaintiff has no experience beyond basic financial matters.

14.     In June of 2005, Plaintiff took out a loan (the Loan) with BNC Mortgage.

15.     Plaintiff relied on and placed her trust and confidence in BNC Mortgage and its broker, expecting an honest and accurate representation of the Loan terms and documents; neither BNC nor its agent represented the Loan and terms accurately.

16.     At the time of taking out the Loan Plaintiff was deceived by the lender and the lender's agent as to the true nature and ramifications of the Loan.

### *WELLS' Failure to Comply With the Home Affordable Modification Program*

17.     On March 4, 2009 President Obama signed into law the Making Home Affordable Plan as part of the Emergency Economic Stabilization Act of 2008.  It is in two parts: the *Home Affordable Refinance* program and the *Home Affordable Modification* (HAMP) program.

18.     On April 13, 2009, WELLS entered into a Servicer Participation Agreement for the *Home Affordable Modification Program* (the "Contract") with Fannie Mae; the latter acted as Financial Agent of the United States. The Contract is attached as Exhibit 1.

////

////

EX. A 19

19.     If a borrower under a loan serviced or owned by WELLS seeks modification, the Contract requires WELLS to first determine eligibility requirements of the borrower and the loan in question.

20.     If the borrower and the loan are eligible, WELLS must then perform a Net Present Value (NPV) Test to compare the value of the money that it would receive if the loan were modified with what the value it could expect from foreclosure.

21.     If WELLS can expect a greater return from modifying the loan, the loan is considered NPV positive; WELLS then **must** modify the loan absent fraud.

22.     If WELLS is a servicer of the loan (as opposed to being the owner of the loan), WELLS **must** modify the loan unless the contractual agreement it has with the actual Holder of the loan prohibits modification. In that case, WELLS is required to use reasonable efforts to obtain waivers or approval of a modification from the Holder.

23.     The modification must result in a monthly payment that includes principal, interest, property taxes and insurance, and any other pertinent fees such as Homeowner Association Dues. The resultant payment cannot exceed 31% of the borrower's gross income. See Exhibit 2, Home Affordable Modification Program Guidelines, March 4, 2009 and Exhibit 3, U.S. Department of the Treasury Making Home Affordable Summary of Guidelines.

24.     Plaintiff attempted to obtain a modification of the Loan through WELLS; both Plaintiff and her loan qualify for the HAMP.

25.     Plaintiff's gross monthly income is approximately $6900; a 31% monthly payment would be $2139.

26.     The NPV tests positive and thus WELLS was obligated to modify Plaintiff's loan

27.     WELLS has failed to comply with the conditions of the Contract.

28.     Through counsel, Plaintiffs attempted to obtain a modification of their loan that would allow them to make a maximum of $2,200 a month payments.

////





29.   WELLS refused to offer such a modification and instead proposed an interest rate of 6% and a monthly payment of $2,700.  That payment would not include property taxes and insurance.

30.   Upon instruction by WELLS, NDEX has scheduled a trustees' sale of Plaintiff's home to take place on **June 11, 2009 at 10:00 a.m.**

### *Harassment of Plaintiff by WELLS*

31.   From September 2008 to March 2009, WELLS representatives began harassing Plaintiff by making continual phone calls to Plaintiff's home and cell phones in an attempt to collect payments on the loan.

32.   Plaintiff informed WELLS representatives on multiple occasions that Plaintiff was represented by an attorney; Plaintiff provided the name and phone number of her attorney; nevertheless, WELLS representatives continued to contact and harass Plaintiff.

33.   WELLS left numerous messages on both Plaintiff's home and cell phones.

34.   WELLS made calls to Plaintiff's cell phone using an automatic telephone dialing system (including an automated dialing machine, dialer, and auto-dialer) and an artificial or prerecorded voice ("autodialer").

35.   Plaintiff is forced to pay for calls to her cell phone.

36.   If Plaintiff did not answer the cell phone, WELLS would leave a prerecorded message on the cell phone voice mail with a similar message that the call was from a debt collector and to call back.

37.   As a result of the acts of the defendants described above, Plaintiffs have suffered damages in an amount to be proven at trial.

## V.  FIRST CAUSE OF ACTION
### (Breach of Written Contract)

38.   Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.



EX. A 21



39.    Plaintiff is a Third Party Beneficiary to the Contract; WELLS and Fannie Mae intended Plaintiff to benefit under the Contract.

40.    WELLS unjustifiably and inexcusably breached the Contract by failing to perform its obligations thereunder as described above.

41.    WELLS'S breach of the Contract will result in the loss of Plaintiff's Home.

42.    Pursuant to Civil Code Section 1559, Plaintiff may enforce the Contract's provisions.

43.    Plaintiff seeks damages according to proof and reserves her rights to seek equitable remedies to prevent the sale of her home.

## VI.  SECOND CAUSE OF ACTION
### (Violation of Rosenthal Act)

44.    Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

45.    Defendants violated the Rosenthal Act, by including but not limited to, the following:

    (a)    The Defendants violated California Civil Code §1788.11(d) by causing a telephone to ring repeatedly or continuously to annoy the person called;

    (b)    The Defendants violated California Civil Code §1788.11(e) by communicating with the Plaintiff with such frequency as to be unreasonable and to constitute an harassment to the Plaintiff under the circumstances;

    (c)    The Defendants violated Civil Code §1788.17 by failing to comply with 15 U.S.C. §1692(e) by using deceptive or misleading representations or means in connection with the collection of a debt because none can produce the Note and Deed of Trust;



EX. A 22

(d)  The Defendants violated 15 U.S.C. § 1692b(6) by communicating with a person other than the Plaintiff's attorney after WELLS knew the Plaintiff was represented by an attorney, thus resulting in a violation of Civil Code §1788.17;

(e)  The Defendants violated California Civil Code §1812.700 by failing to include the notice required by this section.

46.  Defendants' acts as described above were done intentionally with the purpose of coercing Plaintiff to pay the alleged debt.

47.  As a proximate result of Defendants' violations enumerated above, Plaintiff has been damaged in amounts which are subject to proof.

48.  Defendants' violations of the Rosenthal Act were willful and knowing. Defendants are therefore liable to Plaintiff for Plaintiff's actual damages, statutory damages, and attorney's fees and costs pursuant to California Civil Code §1788.30.

## VII. THIRD CAUSE OF ACTION

### (Invasion of Privacy: Intrusion Into Private Affairs)

49.  Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

50.  Plaintiff had a reasonable expectation of privacy in her solitude, seclusion, and private concerns and affairs.

51.  Defendants willfully and intentionally intruded into Plaintiff's solitude, seclusion and private affairs by repeatedly and unlawfully attempting to collect a debt.

52.  Defendants' intrusions would be highly offensive to a reasonable person and did in fact offend Plaintiff.

53.  As a result of such invasions of privacy, Plaintiff was harmed and caused great mental and physical pain.

54.  Defendants acted with oppression or malice and Defendants are therefore liable to Plaintiff for damages in an amount to be proven at trial and for punitive damages.



7
COMPLAINT FOR DAMAGES

EX. A 23



## VIII.  FOURTH CAUSE OF ACTION

### (Violation of TCPA)

55.  Plaintiff repeats and realleges and incorporates by reference all of the foregoing paragraphs.

56.  WELLS improperly invaded the privacy rights of Plaintiff and violated the TCPA by the above-described actions. Defendant's violations include, but are not limited to, the following:

    (a)  By repeatedly making calls using an automatic telephone dialing system, and by transmitting prerecorded or artificial messages, to the Plaintiff's cell phone using an automated telephone dialing system without Plaintiff's express consent and to the expense of Plaintiff in violation of 47 U.S.C. §227(b)(1)(A)(iii).

57.  As a result of the above violations of the TCPA, Defendant is liable to the Plaintiff for declaratory judgment that Defendants' conduct violated the TCPA, Plaintiff's actual damages, statutory damages of $500 for each call, and up to three times statutory damages for willful and knowing violations pursuant to 47 U.S.C. §227(b)(3).

## IX. FIFTH CAUSE OF ACTION

### (Unlawful and Unfair Acts and Practices)

58.  Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

59.  Defendants' violations and tortious conduct -

    (a)    WELLS'S Breach of Contract,

    (b)    WELLS'S violation of Civil Code §1788 et seq.,

    (c)    WELLS'S intrusion into Plaintiff's privacy, and

    (d)    WELLS'S violation of the TCPA,

- are unlawful and unfair business practices or acts under the Unfair Competition Law of Business and Professions Code §17200, *et seq.*

EX. A 24

60.     Plaintiff will seek to enjoin the foreclosure of their home. Should Defendants conduct a trustee's sale of Plaintiff's Home, Plaintiff will seek cancellation of the foreclosure sale and restitution of his home, including lost monies, attorney fees and any civil penalties and other relief that the court deems appropriate.

## X. REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment against Defendants and each of them, for the following:

1. Statutory damages of $500 per telephone call and, additional $1,000 per call, pursuant to 47 U.S.C. 227(b)(3)(B);

2. Statutory damages, attorney's fees and costs pursuant to California Civil Code §1788.30;

3. Punitive damages;

4. Actual damages; and

5. For such other and further relief as the Court may deem just and proper.

THE LAW OFFICE OF ERIC F. FAGAN

Dated: **6/3/2009**

Octavio Cardona-Loya II,
Attorney for Plaintiff

9
COMPLAINT FOR DAMAGES

EX. A 25

# Exhibit 1



**COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT**
**and**
**SERVICER PARTICIPATION AGREEMENT**
for the
**HOME AFFORDABLE MODIFICATION PROGRAM**
under the
**EMERGENCY ECONOMIC STABILIZATION ACT OF 2008**

This Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer"). Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

**Recitals**

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "Program") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, the Program includes loan modification and other foreclosure prevention services;

WHEREAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Program;



WHEREAS, Fannie Mae will, in its capacity as a financial agent of the United States, fulfill the roles of administrator, record keeper and paying agent for the Program, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Program, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will, in its capacity as a financial agent of the United States, fulfill a compliance role in connection with the Program; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Program;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Program with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Program with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of Program participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Program as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree as follows.



**EX. A 27**



### Agreement

#### 1. Services

A.    Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

B.    Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

C.    The recitals set forth above are hereby incorporated herein by this reference.

#### 2. Authority and Agreement to Participate in Program

A.    Servicer shall perform the Services for all mortgage loans its services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

B.    Notwithstanding subsection A., if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

C.    Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

D.    Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

#### 3. Set Up; Prerequisite to Payment

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

- 2 -





as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

**4. Agreement to Purchase Financial Instrument; Payment of Purchase Price**

A. Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B. Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of Investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "<u>Purchase Price</u>"); all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to Investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C. The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D. The value of the Agreement is limited to $2,873,000,000 (the "<u>Program Participation Cap</u>"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers intended to result in new loan modifications will be effected under the Agreement, and no payments will be made with respect to any new loan modifications from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E. Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

- 3 -



other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F.  At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G.  In the event that the Agreement expires or is terminated pursuant to Section 5 or Section 6, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H.  Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I.  Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor or a borrower under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit or account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4.B., or obtain repayment of prior payments made under Section 4.B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4.B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4.B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not





exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

**5. Term**

A. Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extensions by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof or suspension or termination of the Program by the Treasury, provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B. Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term. Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C. The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

**6. Defaults and Early Termination**

A. The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):



(1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

(2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any Investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

- 5 -

EX. A 31



directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an <u>Event of Default by Servicer</u> under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B; and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an <u>Event of Default involving an Investor or a borrower</u> in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mae in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting Investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:



- 6 -

EX. A 32

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. The Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

G. If the event of termination of the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period. If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4, or Section 6.A. 5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

## 8. Transfer or Assignment

A. Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement. Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of Exhibit C (the "Assignment and



EX. A 33

Assumption Agreement"). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.B. with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac. Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

B.  Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement.

## 9. Notices

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial overnight courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12 B. below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

     To Servicer:

         Wells Fargo Bank, N.A.
         1 Home Campus
         Des Moines, Iowa 50328-0001
         Attention: ███████████████

         With a copy to:

         Wells Fargo Bank, N.A.
         1 Home Campus
         Des Moines, Iowa 50328-0001
         Attention : General Counsel, ████████████
         Telephone: ███████████
         Facsimile: ███████████
         email: ████████████████

EX. A 34



To Fannie Mae:

Fannie Mae
3900 Wisconsin Avenue, NW
Washington, DC 20016
Attention: General Counsel
Facsimile: [redacted]
email: [redacted]

To Treasury:

Chief
Office of Homeownership Preservation
Office of Financial Stability
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220
Facsimile: (202) 622-9219

To Freddie Mac:

Freddie Mac
8100 Jones Branch Drive
McLean, VA 22102
Attention: Vice President, Making Home Affordable -- Compliance
Facsimile: (703) 903-2544
Email to: MHA_Compliance@freddiemac.com

**10. Modifications**

A. Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B. Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C. Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impact the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors and borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "Program Modification" and, collectively, the "Program Modifications") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification

and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

**11. Miscellaneous**

A. The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles. Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B. The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C. Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D. Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time. No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof. The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E. The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F. The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G. The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof. In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail. In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H. Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B., 6 F., 6 G., 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

**12. Defined Terms; Incorporation by Reference**

A. All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto. Specific references



EX. A 36



throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B. The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit D (the "Cover Sheet"). The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C. The Program Documentation and Exhibit A – Form of Financial Instrument, Exhibit B – Form of Annual Certification, Exhibit C – Form of Assignment and Assumption Agreement and Exhibit D – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



EX. A 37

In Witness Whereof, Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

SERVICER: Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

By: _____
Name: Michael J. Heid
Title: Co-President
Date: 4-13-09

FANNIE MAE, solely as Financial Agent of the United States

By: _____
Name: Leslie Peeler
Title: Vice President
Date: 4-13-09

## EXHIBITS

Exhibit A    Form of Financial Instrument

Exhibit B    Form of Annual Certification

Exhibit C    Form of Assignment and Assumption Agreement

Exhibit D    Form of Cover Sheet

EX. A 38

## EXHIBIT A

### FORM OF FINANCIAL INSTRUMENT



## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.  Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2.  Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3.  Audits, Reporting and Data Retention.

    (a) Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

    (b) Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in the Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

    (c) Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

- 1 -



EX. A 40

(d) In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Program. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4.   Internal Control Program.

(a) Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b) Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5.   Representations, Warranties and Covenants. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a) Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

(b) Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

- 2 -

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all mortgage modifications and all trial period modifications will be offered to borrowers, fully documented and serviced in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

(d) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(e) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

- 3 -

EX. A 42

(i) Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j) Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(k) Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l) Servicer shall sign and deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as Exhibit B to the Agreement.

6.   Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7.   Data Rights.

(a) For purposes of this Section, the following definitions apply:

(i)   "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program.

(ii)   "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

- 4 -

EX. A 43

(iii) "NPI" means nonpublic personal information, as defined under the GLB.

(iv) "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b) Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Program, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation, in industry standard useable format.

(c) Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including, but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with the Program, provided that no Data placed in the public domain will: (i) contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be identified; or, (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation related statistics such as the number of modifications, performance of modifications, characteristics of the modified loans, or program compensation or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8.  Publicity and Disclosure.

(a) Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b) Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c) Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.  Limitation of Liability. IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

EX. A 44

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.   Indemnification.  Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

_____          _____4-13-09_____
Michael J. Heid                                           Date
Co-President
Wells Fargo Home Mortgage

EX. A 45

## EXHIBIT B

## FORM OF ANNUAL CERTIFICATION



## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.B. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.     Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.     Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.     (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.     Servicer has: (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.     Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.     Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.



EX. A 47



7.      Servicer has disclosed to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8.      Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors. In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.      Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support the Program.

10.     Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required. Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.



[INSERT FULL LEGAL NAME OF SERVICER]:

_____          _____
[Name of Authorized Official]                 Date
[Title of Authorized Official]

EX. A 48

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Assignment.** Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2. **Assumption.** Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3. **Effective Date.** The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. **Successors.** All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. **Counterparts.** This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

- 1 -

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]

ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By:_____
Name:_____
Title:_____
Date:_____

By:_____
Name:_____
Title:_____
Date:_____

EX. A 51

**SCHEDULE 1**

**To**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

EX. A 52

## EXHIBIT D

## FORM OF COVER SHEET

# Exhibit 2



## Home Affordable Modification Program Guidelines
## March 4, 2009

*Trial loan modifications consistent with these Guidelines may be offered to homeowners beginning on this date, March 4, 2009, and may be considered for acceptance into the Home Affordable Modification Program upon completion of the trial period and other conditions. These Guidelines, however, do not constitute a contract offer binding on the Department of the Treasury.*

### Program Elements Described in the Guidelines

| | |
|---|---|
| **Monthly Payment Reduction Cost Share:** | Treasury will partner with financial institutions to reduce homeowners' monthly mortgage payments. The lender will have to first reduce payments on mortgages to no greater than 38% Front-End Debt-to-Income (DTI) ratio. Treasury will match further reductions in monthly payments dollar-for-dollar with the lender/investor, down to a 31% Front-End DTI ratio for the borrower. |
| **Servicer Incentive Payments and Pay for Success Fees:** | Servicers will receive an up-front Servicer Incentive Payment of $1,000 for each eligible modification meeting guidelines established under this initiative. Servicers will also receive Pay for Success payments –as long as the borrower stays in the program – of up to $1,000 each year for up to three years.<br><br>Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Pay-for-Performance Success Payments:** | Borrowers are eligible to receive a Pay-for-Performance Success Payment that goes straight towards reducing the principal balance on the mortgage loan as long as the borrower is current on his or her monthly payments. Borrowers can receive up to $1,000 of Pay-for-Performance Success Payments each year for up to five years. |
| **Current Borrower One-Time Bonus Incentive:** | One-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers will be provided for modifications made while a borrower is still current on mortgage payments. The servicer will be required to maintain records and documentation evidencing that the Trial Period payment arrangements were agreed to while the borrower was less than 30 days delinquent. The servicer must comply with any express pooling and servicing contractual restrictions for modifying current loans. |



EX. A 55



| Program Payment Conditions | No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. Servicers must enter into the program agreements with Treasury's financial agent no later than December 31, 2009. |
|---|---|

## Eligibility Requirements

| Pooling and Servicing Agreements: | The program guidelines reflect usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. Participating servicers are required to consider all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties. |
|---|---|
| Origination Date of Loan Subject to Modification: | The mortgage to be modified must have been originated on or before January 1, 2009. |
| Program Expiration: | New borrowers will be accepted until December 31, 2012. Program payments will be made for up to five years after the date of entry into a Home Affordable Modification. Monitoring will continue through the life of the program. |
| Qualification Terms: | • The home must be an owner occupied, single family 1-4 unit property (including condominium, cooperative, and manufactured home affixed to a foundation and treated as real property under state law).<br>• The home must be a primary residence (verified with tax return, credit report, and other documentation such as a utility bill).<br>• The home may not be investor-owned.<br>• The home may not be vacant or condemned.<br>• Borrowers in bankruptcy are not automatically eliminated from consideration for a modification.<br>• Borrowers in active litigation regarding the mortgage loan can qualify for a modification without waiving their legal rights.<br>• First lien loans must have an unpaid principal balance (prior to capitalization of arrearages) equal to or less than:<br>    o  1 Unit: $729,750<br>    o  2 Units: $934,200 |

2

EX. A 56

|  | o 3 Units: $1,129,250<br>o 4 Units: $1,403,400 |
| --- | --- |
| **In Foreclosure Process:** | Any foreclosure action will be temporarily suspended during the trial period, or while borrowers are considered for alternative foreclosure prevention options. In the event that the Home Affordable Modification or alternative foreclosure prevention options fail, the foreclosure action may be resumed. |
| **Current LTV:** | There is no minimum or maximum LTV ratio for eligibility purposes. |
| **Loan Type Exclusions:** | Loans can only be modified under the Home Affordable Modification program once. |
| **Subordinate Financing:** | Subordinate liens are not included in the Front-End DTI calculation, but they are included in the Back-End DTI calculation. |
| **Solicitation to Borrowers/ Incoming Inquiries:** | Servicers should follow any existing express contractual restrictions with respect to solicitation of borrowers for modifications. |

## Underwriting Analysis

| **Front-End DTI Target:** | Front-End DTI is the ratio of PITIA to Monthly Gross Income. PITIA is defined as principal, interest, taxes, insurance (including homeowners insurance and hazard and flood insurance) and homeowners association and/or condominium fees. Mortgage insurance premiums are excluded from the PITIA calculation.<br><br>The Front-End DTI Target is 31%. The Standard Waterfall step that results in a Front-End DTI closest to 31%, without going below 31%, will satisfy the Front-End DTI Target. There is no restriction on reducing Front-End DTI below 31%, but any portion of the reduction below 31% will not be covered by the Payment Reduction Cost Share. |
| --- | --- |
| **Property Value:** | The servicer may use, at its discretion, either one of the government sponsored enterprises (GSEs) automated valuation model (AVM) – provided that the AVM renders a reliable confidence score – or a broker price opinion (BPO). |



3

EX. A 57

| | |
|---|---|
| | As an alternative, the servicer may rely on the AVM it uses internally provided that (i) the servicer is subject to supervision by a Federal regulatory agency, (ii) the servicer's primary Federal regulatory agency has reviewed the model and/or its validation and (iii) the AVM renders a reliable confidence score.<br><br>If the GSE or servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a property valuation method acceptable to the servicer's Federal regulatory agency, *e.g.* in accordance with the Interagency Appraisal and Evaluation Guidelines (as though such guidelines apply to loan modifications), or a BPO.<br><br>In all cases, the property valuation may not be more than 60 days old. |
| **Income and Asset Validation:** | The borrower's income will be verified by requiring a signed Form 4506-T (Request for Transcript of Tax Return) and obtaining the most recent tax return on file for each borrower on the note. For wage earners, the two most recent pay stubs for each wage earner on the note will also be required. For self-employed borrowers or for non-wage income, the borrower's income will be verified by obtaining other third party documents that provide reasonably reliable evidence of income.<br><br>Borrowers must also represent and warrant that they do not have sufficient liquid assets to make their monthly mortgage payments. |
| **Monthly Gross Income:** | The borrower's Monthly Gross Income is the amount before any payroll deductions includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payment, including Social Security received by adults on behalf of minors or by minors intended for their own support, annuities, insurance polices, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income.<br><br>Monthly net income can be used for preliminary screening and qualification. If used, the servicer will need to multiply net income by 1.25 to get to an estimate of Monthly Gross Income. |
| **Back-End DTI:** | The Back-End DTI is the ratio of the borrower's total monthly debt payments (such as Front-End PITIA, any mortgage insurance premiums, payments on all installment debts, monthly payments on all junior liens, alimony, car lease payments, aggregate negative net rental income from |

4



|  | all investment properties owned, and monthly mortgage payments for second homes) to the borrower's Monthly Gross Income. The servicer must validate monthly installment, revolving debt and secondary mortgage debt by pulling a credit report for each borrower or a joint report for a married couple. The servicer must also consider information obtained from the borrower orally or in writing concerning incremental monthly obligations.<br><br>Borrowers who otherwise qualify for a modification under this program, but who would have a post-modification Back-End DTI greater than or equal to 55%, will be provided with a letter stating that they are required to work with a HUD-approved counselor and the modification will not take effect until they provide a signed statement indicating that they will obtain counseling. |
|---|---|
| **Reasonably Foreseeable / Imminent Default:** | Every potentially eligible borrower who calls or writes in to their servicer in reference to a modification must be screened for hardship. This screen must ascertain whether the borrower has had a change in circumstances that causes financial hardship, or is facing a recent or imminent increase in the payment that is likely to create a financial hardship (payment shock). If the borrower reports a material change in circumstances, the servicer must ask about current income and assets, and current expenses as well as the specific circumstances relating to the claimed financial hardship. Each of these elements shall be verified through documentation.<br><br>If the servicer determines that a non-defaulted borrower facing a financial hardship is in Imminent Default and will be unable to make his or her mortgage payment in the immediate future, the servicer must apply the NPV Test. |
| **Required Modifications and Optional Modifications:** | A standard NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV Test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification. If the NPV of the modification scenario is greater, the NPV result is deemed positive.<br><br>The NPV Test applies to the Standard Waterfall only and does not require consideration of principal forgiveness. However, the servicer may choose to forgive principal if the servicer determines that principal forgiveness improves the likelihood of loan performance and the value of modification. Required parameters for the NPV Test will be published separately. |



5

EX. A 59



> If the NPV Test generates a positive result when applying the Standard Waterfall, the servicer is required to offer a Home Affordable Modification to the borrower. If the NPV Test generates a negative result, modification is optional, unless prohibited under contract. The monthly payment reduction incentive is available for any Home Affordable Modification, whether or not NPV positive, that meets the eligibility requirements and is performed according to the waterfall described below.
>
> If the NPV Test result is negative and a Home Affordable Modification is not pursued, the lender/investor must seek other foreclosure prevention alternatives, including alternative modification programs, deed-in-lieu and short sale programs.

## Loan Modification and Standard Waterfall

| | |
|---|---|
| **Overview:** | Servicers will follow the Standard Waterfall described below to reduce monthly payments to the 31% Front-End DTI Target defined above. The initiative will reimburse lenders/investors for one half of the cost of reducing monthly payments from a level consistent with a 38% Front-End DTI Ratio (or less, if the unmodified DTI is less than 38%) down to a level consistent with a 31% Front-End DTI Ratio. This Payment Reduction Cost Share can last for up to five years. |
| **Hope for Homeowners:** | Servicers will be required to consider a borrower for refinancing into the Hope for Homeowners program when feasible. Servicer incentive payments will be paid for Hope for Homeowner refinances. <br><br> If the underwriting process for a Hope for Homeowners refinance would delay eligible borrowers from receiving a modification offer, servicers will use the Standard Waterfall to begin the Home Affordability Modification and work to complete the Hope for Homeowners refinance during the Trial Modification Period. <br><br> Consideration for a Hope for Homeowners refinance should not delay eligible borrowers from receiving a modification offer and beginning the Trial Modification Period. |
| **Standard Waterfall Process:** | Step 1a: Request Monthly Gross Income as specified above. <br><br> Step 1b: Validate total first lien debt and monthly payments (PITIA). For |

EX. A 60

purposes of making a provisional modification offer during the trial modification period, the borrower's unverified income and debt payments can be used. Provisional information and modification terms will be verified in a timely manner.

Step 2: Capitalize arrearage. Servicers may capitalize accrued interest, past due real estate taxes and insurance premiums, delinquency charges paid to third parties in the ordinary course of servicing and not retained by the servicer, any required escrow advances already paid by the servicer and any required escrow advances by the servicer that are currently due and will be paid by the servicer during the Trial Period. Late fees are not capitalized.

Step 3: Target a Front-End DTI of 31%. The lender/investor shall follow steps 4, 5, and 6 to reduce the borrower's payment to the level corresponding to the Front-End DTI Target.

Step 4: Reduce the interest rate to reach the Front-End DTI Target (subject to a floor of 2%). The note rate should be reduced in increments of 0.125 %, and should bring the monthly payment as close as possible to the Front-End DTI Target without going below 31%. If the resulting modified interest rate is at or above the Interest Rate Cap, this modified interest rate will be the new note rate for the remaining loan term. If the resulting modified interest rate is below the Interest Rate Cap, this modified interest rate will be in effect for the first five years, followed by annual increases of 1% (100 basis points) per year or such lesser amount as may be needed until the interest rate reaches the Interest Rate Cap, at which time it will be fixed for the remaining loan term.

Step 5: If the Front-End DTI Target has not been reached, extend the term of the loan up to 40 years. If term extension is not permitted extend amortization. The 40-year term begins at the start of the modification (after the borrower successfully completes the Trial Period). Note that the servicer should only extend to a term that is necessary to reach the Front-End DTI Target; there is no requirement to extend to a 40-year term.

Step 6: If the Front-End DTI Target has not been reached, forbear principal. If there is a principal forbearance amount, a balloon payment of that forbearance amount is due on the maturity date, upon sale of the property, or upon payoff of the interest bearing balance. If the modification does not pass the NPV Test and the servicer chooses to modify the loan, the modified balance must be no lower than the current property value.

EX. A 61

| Principal Reduction Option: | There is no requirement to use principal reduction under the Home Affordable Modification program; however, servicers may forgive principal to achieve the Front-End DTI Target.<br><br>Principal forgiveness can be used on a standalone basis or before any step in the Standard Waterfall process. If principal forgiveness is used, subsequent steps in the Standard Waterfall may not be skipped. If principal is forgiven and the rate is not reduced, the rate will be frozen at its existing level and treated as a modified rate for the purposes of the Interest Rate Cap.<br><br>In the event of principal forgiveness, the Payment Reduction Cost Share continues to be based on the change in the borrower's monthly payment from 38% to 31% Front-End DTI ratio and is limited to five years. |
|---|---|

## Modification Terms

| Interest Rate Floor: | The Interest Rate Floor for modified loans is 2%. |
|---|---|
| Interest Rate Cap: | The modified interest rate must remain in place for five years, after which time the interest rate will be gradually increased 1% (100 basis points) per year or such lesser amount as may be needed until it reaches the Interest Rate Cap.<br><br>The Interest Rate Cap for the modified loan is the lesser of (i) the fully indexed and fully amortizing original contractual rate or (ii) the Freddie Mac Primary Mortgage Market Survey rate for 30-year fixed rate conforming mortgage loans, rounded to the nearest 0.125%, as of the date that the modification document is prepared.<br><br>If the modified rate exceeds the Freddie Mac Primary Mortgage Market Survey rate in effect on the date the modification document is prepared, the modified rate will be the new note rate for the remaining loan term. |

EX. A 62



| Principal Forbearance: | No interest will accrue on the forbearance amount.<br><br>If the option to forebear principal is selected, the servicer shall forbear on collecting the deferred portion of the Capitalized Balance until the earliest of (i) the maturity of the modified loan, (ii) a sale of the property, or (iii) a pay-off or refinancing of the loan. |
| --- | --- |
| Redefaulting Loans: | A loan will be considered to have redefaulted when the borrower reaches a 90-day delinquency status under the MBA delinquency calculation. Redefaulting Loans will be terminated from the program, and no further payments of any kind will be made to the lender/investor, servicer, or borrower. Redefaulting Loans should be considered for other loss mitigation programs prior to being referred to foreclosure. |

## Approval Conditions

| Trial Period Required: | Successful completion of the trial modification period and entry into program agreements between the servicer and Treasury's financial agent are prerequisites for any payments to the lender/investor, servicer, or borrower.<br><br>Modification is effective the first calendar month following the successful completion of the Trial Period. Successful completion means that the borrower is current (under the MBA delinquency calculation) at the end of the Trial Period.<br><br>Borrowers in foreclosure restart states will be considered to have failed the Trial Period if they are not current at the time the foreclosure sale is scheduled.<br><br>No payments under the program to the lender/investor, servicer, or borrower will be made during the Trial Period. No payments under the program to the lender/investor, servicer, or borrower will be made if the Trial Period is not completed successfully. No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. |
| --- | --- |
| Length of Trial Period: | The Trial Period will last 90 days (three payments at modified terms) or longer if necessary to comply with investor contractual obligations. The |



9



| | borrower must be current at the end of the Trial Period to obtain a Home Affordable Modification. |
|---|---|
| **Escrows:** | Servicers are required to escrow for modified borrowers' real estate taxes and mortgage-related insurance payments immediately if they have the capability of processing these payments or are already using a third-party vendor for this purpose. Servicers who do not have this capacity must implement an escrow process within six months of the program agreement. |
| **Counseling Requirements:** | For borrowers with a Back-End DTI of 55% or higher, the servicer must inform the borrower of the availability and advantages of counseling and provide a list of local HUD-approved counselors. The servicer must provide the borrower with a letter stating that counseling is a requirement of the modification terms. This letter may be required by counselors in order to begin counseling. The modification will not take effect until the borrower represents in writing that he or she will obtain counseling. |
| **Assumable:** | If the modified loan was assumable prior to modification, a Home Affordable Modification cancels this feature. |

## Fees/Charges

| **Modification Fees and Charges to Borrower:** | There are no modification fees or charges borne by the borrower. |
|---|---|
| **Modification Fees and Charges Reimbursable by Investor:** | Modification fees and charges to the servicer will be reimbursable by the investor. These include notary fees, property valuation and other required fees. Servicer reimbursement by the investor will take place within the normal process between the servicer and the investor. |
| **Unpaid Late Fees Waived:** | Unpaid late fees will be waived for the borrower. These include late fees prior to the start of the Trial Period and accrued during the period. |
| **Credit Report:** | The servicer will cover the cost of the credit report. |

EX. A 64



## Compensation

| Servicer Compensation: | Compensation is provided to the servicer that performs the loss mitigation or modification activities. Upon modification following successful completion of the Trial Period, and contingent on signing the program servicer agreement, the servicer will receive an incentive fee of $1,000 for each eligible modification meeting Home Affordable Modification guidelines. |
|---|---|
| | Servicers will also receive Pay for Success fees – payable 12 months from the effective date of the Trial Period as long as the borrower continues in the program – of up to $1,000 each year for three years. Servicers will no longer receive Pay for Success incentive payments for Redefaulting Loans or for loans that have paid off subject to certain *de minimis* constraints (discussed below). |
| | For loans modified while still current under the MBA delinquency calculation, the servicer will receive a Current Borrower One-Time Incentive of $500 following successful completion of the Trial Period. |
| | Lenders that service their own loans are eligible for these incentives. Throughout this document the term "servicer" means the party that is responsible for performing the modification activities. |
| | Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Cash Contribution:** | The investor may not require the borrower to contribute cash. |
| **Lender/Investor Compensation:** | Lenders/investors will be compensated only in the event that the Front-End DTI Target or a lower Front-End DTI is achieved. Lenders/investors will follow the Standard Waterfall specified above to reach a monthly payment that satisfies the Front-End DTI Target. As described above, Treasury will provide compensation based on one half of the dollar difference between the monthly payment for a 31% Front-End DTI Ratio and the lesser of (i) the monthly payment for a 38% Front-End DTI Ratio or (ii) the borrower's current monthly payment. This compensation will be provided for up to five years or until the loan is paid off. |
| | Upon a modification becoming effective following successful completion of the Trial Period by a borrower who was current prior to the start of the Trial Period, lenders/investors will be paid a $1,500 Current Borrower One-Time Incentive, subject to certain *de minimis* constraints (discussed below). |

11



EX. A 65

| | |
|---|---|
| | No monthly lender/investor payments will be made during the Trial Period. Monthly lender/investor payments will begin after the Trial Period is successfully completed, the servicer signs a service agreement with Treasury, and formal modification begins. No monthly lender/investor payments will be made if the Trial Period is not completed successfully. |
| **Borrower Compensation:** | Borrowers will be eligible to accrue up to $1,000 each year in Pay-for-Performance Success Payments for up to five years, a total of up to $5,000 over five years, subject to certain *de minimis* constraints (discussed below). Accruals are based on on-time payment performance. The first annual principal balance reduction will be effective 12 months after entering the Trial Period as long as the borrower is not terminated from the program. In any given month, the borrower's mortgage payment must be made on time, accounting for standard servicer grace periods, in order to accrue the monthly Pay for Performance Success Payment. The borrower will receive information on a monthly basis regarding the accrual of these payments.<br><br>The payment will be directed to the servicer, who will reduce the principal balance by the payment amount (but not by more than $1,000 per year) for five years if the borrower continues in the program. Payments are to be applied directly and entirely to reduce the principal balance, and any applicable prepayment penalties on partial principal prepayment made by the government must be waived. The equivalent of three months of Pay-for-Performance Success Payments will be made upon successful completion of the Trial Period, contingent upon the servicer signing a service agreement with the Treasury.<br><br>Borrowers who are terminated from the program lose their right to outstanding accruals. |
| ***De Minimis* Constraint:** | To qualify for servicer Pay for Success payments and borrower Pay for Performance Success Payments, the modification must reduce the monthly payment by a minimum of 6 %. The monthly payment is the PITIA payment, as used in defining DTI, with the loan fully indexed and fully amortized.<br><br>When paid, servicer annual Pay for Success payments and borrower Pay for Performance Success Payments will be the lesser of (i) $1,000 or (ii) half the reduction in the borrower's annualized monthly payment.<br><br>The *de minimis* constraint does not apply to the up-front Servicer |

12

EX. A 66

|  | Incentive Payment, the Payment Reduction Cost Share, or the Home Price Depreciation Reserve Payment. |
|---|---|

## Consumer Protection

| Disclosure | When promoting or describing loan modifications, servicers should provide borrowers with information designed to help them understand the modification terms that are being offered and the modification process. Servicers also must provide borrowers with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions. |
|---|---|
| Fair Lending | Servicers' modifications under this program must comply with the Equal Credit Opportunity Act and the Fair Housing Act, which prohibit discrimination on a prohibited basis in connection with mortgage transactions. Loan modification programs are subject to the fair lending laws, and servicers and lenders should ensure that they do not treat a borrower less favorably than other borrowers on grounds such as race, religion, national origin, sex, marital or familial status, age, handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit redlining. |
| Consumer Inquiries and Complaints | Servicers should have procedures and systems in place to be able to respond to inquiries and complaints relating to loan modifications. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution. |

## Monitoring

| Documentation: | Servicers will be required to maintain records of key data points for verification/compliance reviews. These documents may include, but are not limited to, borrower eligibility and qualification, underwriting criteria, and incentive payments. These documents also include a hardship affidavit, which every borrower is required to execute.

Borrowers will be required to provide declarations under penalty of perjury attesting to the truth of the information that they have provided to the servicer to allow the servicer to determine the borrower's eligibility for entry into the Home Affordable Modification Program. |
|---|---|

13

EX. A 67

| | Detailed guidance on data requirements will be released separately. |
|---|---|
| **Anti-Fraud Measures:** | Measures to prevent and detect fraud, such as documentation and audit requirements, will be described in the servicer guidelines and the program guidelines in the financial agency agreements with Fannie Mae and Freddie Mac. Additional fraud protection measures will be announced by Treasury.<br><br>Participating servicers and lenders/investors are not required to modify the loan if there is reasonable evidence indicating the borrower submitted false or misleading information or otherwise engaged in fraud in connection with the modification. Servicers should employ reasonable policies and/or procedures to identify fraud in the modification process. |
| **Data Collection:** | Servicers will be required to collect and transmit borrower and property data in order to ensure compliance with the program as well as to measure its effectiveness. Data elements may include data needed to perform underwriting analysis, loan modification and waterfall analysis, and modification terms. In addition, borrower profiles and property level information may be included. Detailed guidance on data requirements will be released separately. |
| **Accounting and Legal:** | The provisions of the Program should not be construed to override, void or in any way modify the responsibility of the management of lenders and servicers for preparing financial statements and regulatory reports in accordance with all applicable generally accepted accounting principles, including standards such as Statement of Financial Accounting Standards (SFAS) No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings*, SFAS No. 114, *Accounting by Creditors for Impairment of a Loan*, SFAS No. 133, *Accounting for Derivative Instruments and Hedging* Activities, SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, and AICPA Statement of Position 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer*, and their related amendments and interpretations. |

## Other Program Features

| | |
|---|---|
| **Home Price Depreciation Payments:** | To encourage lenders/investors to modify more mortgages, compensation will be provided to partially offset probable losses from home price declines. This will be structured as a simple cash payment on each modified loan while the loan remains active in the program. |

EX. A 68

| | |
|---|---|
| **Payments for Short Sales and Deeds-in-Lieu:** | Compensation will be provided to servicers and borrowers in order to facilitate short sales or deeds-in-lieu in those cases in which borrowers either fail the net present value (NPV) test (described below) or fail to qualify for, or default under, the modification program. |
| **Second Lien Elimination Payments:** | To reduce the borrower's overall indebtedness and improve loan performance, additional incentives will be provided to extinguish junior liens on homes with first-lien loans that are modified under the program. |
| **Government Loan Programs:** | FHA, VA and rural housing loans will be addressed through standalone modification programs run by those agencies. FHA's Hope for Homeowners refinancing program will also be included in a parallel incentive program. |

15

EX. A 69

# Net Present Value Model Parameters

| | |
|---|---|
| **NPV Test:** | An NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification. If the NPV of the modification scenario is greater, the NPV result is deemed positive, and the servicer must modify the loan (absent fraud, etc.) However, an "NPV positive" result is not necessary to qualify a loan for a Home Affordable Modification and the associated lender/investor, servicer, and borrower payments. |
| **Standard NPV Model:** | To provide a consistent and industry-wide approach to the required NPV Tests, Treasury will set forth a Standard NPV Model with parameters specified below. Complete details on each component outlined below are forthcoming. |
| **Discount Rate:** | The program allows the servicer to choose the Discount Rate to use in the NPV Model, subject to a program-determined ceiling that will be sensitive to the market-determined cost of funds. The ceiling on the allowable Discount Rate for the NPV Test is the Freddie Mac Primary Mortgage Market Survey rate (PMMS), plus a spread of 2.5 percentage points. The PMMS is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin.<br><br>The servicer may choose a different Discount Rate for loans in portfolio versus loans in investor pools, but may not otherwise apply different rates to different loans in the servicing book. For example, it may choose to use a Discount Rate equal to the PMMS + 2.0 percent for its investor pools and a Discount Rate equal to the PMMS for its loans in portfolio. |
| **Cure Rate and Redefault Rate:** | The Cure Rates and Redefault Rates will be obtained from a default equation with parameters based on GSE analytics and program portfolio data except where servicers use custom parameters (see below). Treasury, in consultation with an inter-agency team of government officials, will update these tables periodically based on incoming data. |
| **Property Value:** | Property value will be determined in accordance with the Guidelines. |

EX. A 70



| | |
|---|---|
| **Incentive Payments:** | Incentive payments, including the Payment Reduction Cost Share, annual borrower performance bonus payments toward principal, and Current Borrower One-Time Bonus Incentive, will be determined in accordance with the Guidelines. |
| **Other Parameters:** | The remaining parameters will come from data sets held or produced by the Federal Housing Finance Agency: home price forecast, valuation of the house price depreciation reserve, foreclosure timelines, and foreclosure costs and REO stigma |
| **NPV Test Customization:** | Servicers having at least a $40 billion servicing book will have an option to substitute a set of Cure Rates and Redefault Rates estimated based on the experience of their own aggregate portfolios. A servicer using this option should take into account, as feasible, current LTV, current DTI, current credit score, delinquency status, and other relevant variables the servicer identifies.

The Cure and Redefault Rates must be empirically validated where possible. Servicer judgment regarding the effect of DTI is expected, given the limited data available and the likelihood that the new program will materially affect Cure and Redefault Rates. However, all assumptions must be tested as program data become available and revised as appropriate.

A servicer who chooses to use customized Cure and Redefault Rates must apply the same assumptions for Cure and Redefault Rate to the entire servicing portfolio, without distinguishing between loans in portfolio and investor pools.

Models and assumptions will be subject to review by federal bank supervisory agencies where applicable, and in all cases by Freddie Mac as program compliance agent.

A servicer not meeting the size threshold may apply for permission to apply Cure Rates and Redefault Rates estimated based on the servicer's portfolio experience. |
| **Mortgage Insurance:** | For loans that have mortgage insurance (MI) coverage, the NPV Test will incorporate the value of the contingent claim payment in the event of default when evaluating projected foreclosure or modification scenarios. If the modification does not pass the NPV Test, then it will be referred to the appropriate MI company. The major MI companies have agreed to develop a mechanism by which they will pay partial claims where they deem appropriate to avoid foreclosure. |



17

EX. A 71

# Exhibit 3

**U.S. DEPARTMENT OF THE TREASURY**
Washington
March 4, 2009

### Making Home Affordable
Summary of Guidelines

Making Home Affordable *will offer assistance to as many as 7 to 9 million homeowners*, making their mortgages more affordable and helping to prevent the destructive impact of foreclosures on families, communities and the national economy.

*The Home Affordable Refinance* program will be available to 4 to 5 million homeowners who have a solid payment history on an existing mortgage owned by Fannie Mae or Freddie Mac. Normally, these borrowers would be unable to refinance because their homes have lost value, pushing their current loan-to-value ratios above 80%. Under the Home Affordable Refinance program, many of them will now be eligible to refinance their loan to take advantage of today's lower mortgage rates or to refinance an adjustable-rate mortgage into a more stable mortgage, such as a 30-year fixed rate loan.

GSE lenders and servicers already have much of the borrower's information on file, so documentation requirements are not likely to be burdensome. In addition, in some cases an appraisal will not be necessary. This flexibility will make the refinance quicker and less costly for both borrowers and lenders. The Home Affordable Refinance program ends in June 2010.

*The Home Affordable Modification* program will help up to 3 to 4 million at-risk homeowners avoid foreclosure by reducing monthly mortgage payments. Working with the banking and credit union regulators, the FHA, the VA, the USDA and the Federal Housing Finance Agency, the Treasury Department today announced program guidelines that are expected to become standard industry practice in pursuing affordable and sustainable mortgage modifications. This program will work in tandem with an expanded and improved Hope for Homeowners program.

With the information now available, **servicers can begin immediately to modify eligible mortgages under the Modification program so that at-risk borrowers can better afford their payments.** The detailed guidelines (separate document) provide information on the following:

Eligibility and Verification
- Loans originated on or before January 1, 2009.
- First-lien loans on owner-occupied properties with unpaid principal balance up to $729,750. Higher limits allowed for owner-occupied properties with 2-4 units.
- All borrowers must fully document income, including signed IRS 4506-T, two most recent pay stubs, and most recent tax return, and must sign an affidavit of financial hardship.
- Property owner occupancy status will be verified through borrower credit report and other documentation; no investor-owned, vacant, or condemned properties.
- Incentives to lenders and servicers to modify at risk borrowers who have not yet missed payments when the servicer determines that the borrower is at imminent risk of default.
- Modifications can start from now until December 31, 2012; loans can be modified only once under the program.

Loan Modification Terms and Procedures
- Participating servicers are required to service all eligible loans under the rules of the program unless explicitly prohibited by contract; servicers are required to use reasonable efforts to obtain waivers of limits on participation.
- Participating loan servicers will be required to use a net present value (NPV) test on each loan that is at risk of imminent default or at least 60 days delinquent. The NPV test will compare the net present value of cash flows with modification and without modification. If the test is positive

EX. A 73

## SAN DIEGO COUNTY SUPERIOR COURT,
## CENTRAL DIVISION, CALIFORNIA

ELIZABETH HURREY-MAYER          )
                                )
    Plaintiffs              )
                                )
v.                              )    Case Number: 37-2009-00090985
                                )           CU OR CTL
WELLS FARGO HOME MORTGAGE,      )
INC.                            )
                                )
    Defendants               )
_____)

### TELEPHONIC NOTICE OF AN EX PARTE APPLICATION FOR A
### TEMPORARY RESTRAINING ORDER

The following notice was provided telephonically to Corporation Service Company as registered agent for Wells Fargo Home Mortgage, Inc. on June 8, 2009:

Octavio Cardona, attorney for plaintiff, will appear before the presiding judge at the San Diego County Superior Court, Central Disivion, 330 West Broadway, Department 65, San Diego, CA 92101, on June 11, 2009 at 8:30 AM, to present an ex parte application for a Temporary Restraining Order.

Octavio Cardona
The Law Offices of Eric Fagan
2300 Boswell Road, Suite 211
Chula Vista, CA 91914
619-656-6656

EX. A 74

1  Octavio Cardona-Loya II, Esq. (SBN 255309)
2  Law Offices of Eric F. Fagan
3  2300 Boswell Rd. Suite 211
   Chula Vista, CA 91914
4  vito@efaganlaw.com
5  T: 619-656-6656 / F: 775-898-5471
   Attorney for Plaintiff Elizabeth A. Hurrey-Mayer

6

7

8
               **SUPERIOR COURT OF CALIFORNIA**
9            **SAN DIEGO COUNTY, CENTRAL DIVISION**

10

11  ELIZABETH A. HURREY-MAYER, an    ) Case No.: 37-2009-00090985-CU-OR-
12  individual,                       ) CTL
                                      )
13          Plaintiff,                ) **Plaintiff's Ex Parte Notice and**
                                      ) **Application for Temporary Restraining**
14                                    ) **Order and An Order to Show Cause Re:**
    v.                                ) **a Preliminary Injunction;**
                                      ) **Memorandum of Points and Authorities**
16  WELLS FARGO HOME MORTGAGE, INC.  )
    d.b.a. AMERICA'S SERVICING        )
17  COMPANY, a corporation;  and DOES 1 )
18  through 10 inclusive,             ) Date: June 11, 2009
                                      ) Time: 8:30 a.m.
19                                    ) Dept.: C-65
            Defendants.               )
20                                    ) The Hon. Joan M. Lewis
                                      )
21  _____ )

22               **NOTICE AND APPLICATION**

23        TO DEFENDANTS: PLEASE TAKE NOTICE that on June 11, 2009, at 8:30 a.m., in

24  Department C-65 of the San Diego Superior Court located at 330 W. Broadway, San Diego,

25  CA 92101, Plaintiff will apply for a Temporary Restraining Order restraining Defendants

26  WELLS FARGO HOME MORTGAGE, INC. d.b.a. AMERICA'S SERVICING

27  COMPANY, a corporation; its agents, employees, representatives, attorneys and all persons

28  acting in concert or participating with them from foreclosing and/or selling Plaintiff's

EX. A 75



residential property located at 10009 Anoel Court, Spring Valley CA 91977 ("Plaintiff's Home"). Plaintiff has given over 48 hours' notice to the above foreclosing Defendants in this action.

The application is made on the grounds that pecuniary compensation would not afford adequate relief for the loss of Plaintiff's Home, that Defendants are seeking to foreclose on Plaintiff's Home in violation of the rights of Plaintiff, and that great and irreparable injury will result to Plaintiff.

The application is based upon this notice, the Complaint on file, the attached memorandum of points and authorities, the Declaration of Octavio Cardona-Loya II, the Declaration of Elizabeth A. Hurrey-Mayer, and any oral argument which may be heard at the time of the hearing on this matter.

THE LAW OFFICE OF ERIC F. FAGAN

Date: 6/9/09

Octavio Cardona-Loya II,
Attorney for Plaintiff



Plaintiff's Ex Parte Notice and Application for Temporary Restraining Order and An Order to Show Cause Re: a Preliminary Injunction; Memorandum of Points and Authorities

EX. A 76

# I. INTRODUCTION

Plaintiff Elizabeth A. Hurrey-Mayer filed this suit in order to enforce the provisions of Defendant's contract with Fannie Mae as a third-party beneficiary, to address the impending wrongful foreclosure, and for damages caused by WELLS' unlawful debt collection acts. Ms. Hurrey-Mayer requires an order to restrain Defendant WELLS from foreclosing on her home and to prevent irreparable injury until it complies with the contract's terms.

# II. ISSUES

**I.      Whether Ms. Hurrey-Mayer, as a Third-Party Beneficiary to Defendant's Contract with Fannie Mae, May Enjoin the Foreclosure Sale of Her Home When Defendant Agreed to Modify Loans in Lieu of Foreclosure.**

Defendant contracted with Fannie Mae to provide foreclosure prevention services intending to benefit homeowners with affordable loan modifications. In return, Defendant received nearly $3 billion as incentive to do.  The impending sale must be enjoined until Defendant complies with the terms of the contract, of which Plaintiff is a third-party beneficiary.

**II.     Whether Defendants Are Engaged in Unfair and Unlawful Business Practices Which Allows Plaintiff to Seek Injunctive Relief.**

Bus. & Prof. Code §17200 *et seq.* bars unfair business practices and allows injunctive relief. Plaintiff has alleged a breach of contract with Fannie Mae.

# III. STATEMENT OF FACTS

On March 4, 2009 President Obama signed into law the Making Home Affordable Plan.  It is in two parts: the *Home Affordable Refinance* program and the *Home Affordable Modification* program (HAMP). (Complaint at ¶17.) On April 13, 2009, Defendant WELLS FARGO opted into HAMP by signing a Servicer Participation Agreement with Fannie Mae who acted as Financial Agent of the United States (the "Contract"). The Contract is attached to the Complaint as Exhibit 1. (*Id.* at ¶18.)

EX. A 77

1    If the borrower and the loan are eligible, WELLS must then perform a Net Present

2  Value Test. This test compares the value of the money that WELLS would receive if the

3  loan were modified with that it could expect from foreclosure. (Complaint at ¶20.) If

4  WELLS can expect a greater return from modifying the loan, WELLS then **must** modify the

5  loan absent fraud. (*Id.* at ¶21.) If WELLS is a servicer of the loan (as opposed to being the

6  owner of the loan), WELLS **must** modify the loan unless the contractual agreement it has

7  with the actual Holder of the loan prohibits modification. In that case, WELLS is required to

8  use reasonable efforts to obtain waivers or approval of a modification from the Holder. (*Id.* at

9  ¶22.)

10    The modification must result in a monthly payment that includes principal, interest,

11  property taxes and insurance, and any other pertinent fees such as Homeowner Association

12  Dues. The resultant payment cannot exceed 31% of the borrower's gross income. (*Id.* at ¶23

13  and *Exhibits 2-3.*) Plaintiff attempted to obtain a modification of the Loan through WELLS;

14  both Plaintiff and her loan qualify under HAMP. (*Id.* at ¶24.)

15    Through counsel, Plaintiff attempted to obtain a modification of her loan that would

16  allow her to make a maximum of $2,200 a month payments; such a payment exceeds the

17  31% gross monthly income term of the Contract. As WELLS can expect a greater return

18  from modifying the Plaintiff's loan, WELLS failed to comply with the conditions of the

19  Contract. (*Id.* at ¶¶24-28.) WELLS' only endeavor to assist Plaintiff was offering a

20  modification of the loan in March 2009 at an interest rate of 7.125% (Declaration of

21  Elizabeth A. Hurrey-Mayer at ¶9.) Defendant continues to refuse to comply with the

22  Contract and has instead instructed its agent, NDEx West, L.L.C. as sale trustee, to foreclose

23  on Ms. Hurrey-Mayer's home; the sale date is scheduled for **June 11, 2009 at 10:00 a.m.** (*Id.*

24  at ¶30.)

25  ////

26  ////

27  ////

28  ////

EX. A 78



## IV. ARGUMENT

**I.      Ms. Hurrey-Mayer, as a Third-Party Beneficiary to Defendant's Contract with Fannie Mae, May Enjoin the Foreclosure Sale of Her Home When Defendant Agreed to Modify Loans in Lieu of Foreclosure.**

A.      Ms. Hurrey-Mayer's Status as Third-Party Beneficiary

"Traditional third party beneficiary principles do not require that the person to be benefited be named in the contract." (*Harper v. Wausau Insurance Corp.* (1997) 56 Cal.App.4th 1079, 1086.)

> "A third party may qualify as a beneficiary under a contract where the contracting parties must have intended to benefit that individual and such intent appears from the terms of the agreement. (*Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 558.) However, "[i]nsofar as intent to benefit a third person is important in determining his right to bring an action under a contract, it is sufficient that the promisor must have understood that the promisee had such intent. No specific manifestation by the promisor of an intent to benefit the third person is required. (*Lucas v. Hamm* (1961) 56 Cal.2d 583, 591.)" (CACI 301.)

The *Lucas* court held "that intended beneficiaries of a will who lose their testamentary rights because of failure of the attorney who drew the will to properly fulfill his obligations under his contract with the testator may recover as third-party beneficiaries." (*Ibid.*)

Ms. Hurrey-Mayer is a third-party beneficiary under the Contract.  Although not specifically named in the Contract, WELLS convenanted to "perform the loan modification and other foreclosure prevention services described in … the Program guidelines and procedures issued by the treasury…" for qualified loans. (Complaint, *Exhibit 1* at p. 2, ¶1.) The Guidelines, attached to the Complaint as *Exhibit 2*, specify at page two the borrower qualification terms:

> "• The home must be an owner occupied, single family 1-4 unit property (including condominium, cooperative, and manufactured

5

Plaintiff's Ex Parte Notice and Application for Temporary Restraining Order and An Order to Show Cause Re: a Preliminary Injunction; Memorandum of Points and Authorities

EX. A 79

home affixed to a foundation and treated as real property under
state law).
• The home must be a primary residence (verified with tax return,
credit report, and other documentation such as a utility bill).
• The home may not be investor-owned.
• The home may not be vacant or condemned.
• Borrowers in bankruptcy are not automatically eliminated from
consideration for a modification.
• Borrowers in active litigation regarding the mortgage loan can
qualify for a modification without waiving their legal rights.
• First lien loans must have an unpaid principal balance (prior to
capitalization of arrearages) equal to or less than:
o 1 Unit: $729,750."

Ms. Hurrey-Mayer meets all of the the above criteria. (Declaration of Elizabeth A. Hurrey-Mayer at ¶¶ 2-6.)  As a qualified loan, WELLS and Fannie Mae intended to benefit the Plaintiff by entering into the Contract.  Ms. Hurrey-Mayer is thus a third-party beneficiary and may seek redress for its breach.


B.    Defendant's Breach of the Contract

The terms of the contract state WELLS "shall perform the Services for all mortgage loans it services." (Complaint, *Exhibit 1* at p. 2, ¶2(A).)  Under the Guidelines, WELLS must perform a Net Present Value (NPV) Test to compare the value of the money that it would receive if the loan were modified with what the value it could expect from foreclosure. (Complaint at ¶20; *Exhibit 2* at p. 5.)   If the NPV of the modification scenario is greater, the NPV result is deemed positive and WELLS is required to offer a Home Affordable Modification to the borrower. (*Id.* at p. 6.)

Here, WELLS did not perform the NPV Test; had it done so, it would clearly see Ms. Hurrey-Mayer is entitled to the trial period of a modification.  The NPV of Plaintiff's home at best is $280,000, the fair market value of the home.  Under a modification at 4% amortized over a 40 year period, the NPV yields $747,658. (Declaration of Elizabeth A. Hurrey-Mayer at ¶¶ 7-8.)  Thus, WELLS is required to offer a modification.

EX. A 80



1    Modifications required under the contract must start with a three-month trial period,

2   for the borrower to show they can afford the modified loan. (<u>Complaint</u>; *Exhibit 2* at p. 9.)

3   Ms. Hurrey-Mayer is entitled to this trial period with a modified loan.

4       **II.    Defendants Are Engaged in Unfair and Unlawful Business Practices Which**

5   **Allows Plaintiff to Seek Injunctive Relief**

6       Bus. & Prof. Code §17200 states "unfair competition shall mean and include any

7   unlawful, unfair or fraudulent business act or practice...."  Section 17203 states "[a]ny

8   person who engages, has engaged, or proposes to engage in unfair competition may be

9   enjoined in any court of competent jurisdiction."

10      Defendant's breach of contract as shown above constitutes an unlawful and unfair

11  business act.  Plaintiff is entitled to injunctive relief to prevent Defendant from continuing to

12  engage in such acts.

13      **III.   Injunctive Relief is Proper to Stop a Wrongful Foreclosure**

14      A.    <u>The Court Should Grant Injunctive Relief When It Appears By The</u>

15           <u>Complaint That a Plaintiff Is Entitled to Relief.</u>

16      Code Civ. Proc. §526(a)(1) holds a Court may grant an injunction "When it appears

17  by the complaint that the plaintiff is entitled to the relief demanded, and the relief, or any part

18  thereof, consists in restraining the commission or continuance of the act complained of, either

19  for a limited period or perpetually."

20      Here, the complaint and its accompanying documents clearly show that Defendant is

21  not entitled to foreclose upon Plaintiff's Home.

22      B.    <u>The Court Should Halt The Foreclosure Proceedings Because</u>

23           <u>Plaintiff Will Be Irreparably Harmed.</u>

24      Code Civ. Proc. §526 (a)(2) indicates that an injunction is appropriate where

25  irreparable harm may be suffered by the applicant if relief is not granted.

26      All real property is unique.  Money cannot compensate for the loss of a home.  No

27  legal remedy will assist Plaintiff; there is a conclusive presumption of inadequacy of

28  damages when dealing with single-family dwellings. (Civ. Code §3387.)

7

Plaintiff's Ex Parte Notice and Application for Temporary Restraining Order and An Order to Show Cause Re: a Preliminary
Injunction; Memorandum of Points and Authorities

EX. A 81



1    C.    The Court Should Grant An Injunction Because Defendant Is

2          Threatening Acts Which Would Render Judgment Ineffectual.

3          Code Civ. Proc. §526 (a)(3) holds an injunction may be granted "When it appears,

4    during the litigation, that a party to the action is . . . about to do . . .some act in violation of

5    the rights of another party. . . tending to render the judgment ineffectual."

6          Defendants plan to wrongfully divest Plaintiff of her home on June 11, 2009 at 10:00

7    a.m.  A judgment after the fact will not compensate Plaintiff for the loss.

8    D.    The Court Should Not Permit Foreclosure if its Propriety is in Question.

9          "Given the drastic implications of a foreclosure, it is not surprising to find courts quite

10   frequently granting preliminary injunctions to forestall this remedy while the court considers

11   a case testing whether it is justified under the facts and law." (*Baypoint Mortgage Corp. v.*

12   *Crest Premium Real Estate etc. Trust* (1985) 168 Cal.App.3d 818, 825.)

13         Given Defendant's unlawful practices as described above, the foreclosure sale of

14   Plaintiff's Home must be prevented.

15                                    **V.  CONCLUSION**

16         Defendant WELLS FARGO has breached its contract with Fannie Mae.  As a third-

17   party beneficiary, Ms. Hurrey-Mayer respectfully requests that the Court enjoin the sale of

18   her home until WELLS FARGO complies with the terms of the contract agreed to.

19

20

21                         THE LAW OFFICES OF ERIC F. FAGAN

22

23

24

25   Date: 6/9/09

26                         Octavio Cardona-Loya II,
                           Attorney for Plaintiff

27

28

EX. A 82

Octavio Cardona-Loya II, Esq. (SBN 255309)
Law Offices of Eric F. Fagan
2300 Boswell Rd. Suite 211
Chula Vista, CA 91914
vito@efaganlaw.com
T: 619-656-6656 / F: 775-898-5471
Attorney for Plaintiff Elizabeth A. Hurrey-Mayer

### SUPERIOR COURT OF CALIFORNIA
### SAN DIEGO COUNTY, CENTRAL DIVISION

| | |
|---|---|
| ELIZABETH A. HURREY-MAYER, an individual, | ) Case No.: 37-2009-00090985-CU-OR-<br>) CTL<br>) |
| Plaintiff, | ) **Declaration of Elizabeth A. Hurrey-**<br>) **Mayer in Support of Her Ex Parte** |
| v. | ) **Application for Temporary Restraining**<br>) **Order and an Order to Show Cause** |
| WELLS FARGO HOME MORTGAGE, INC.<br>d.b.a. AMERICA'S SERVICING<br>COMPANY, a corporation; and DOES 1<br>through 10 inclusive, | )<br>) Date: June 11, 2009<br>) Time: 8:30 a.m.<br>) Dept.: C-65 |
| Defendants. | )<br>) The Hon. Joan M. Lewis<br>) |

I, Elizabeth A. Hurrey-Mayer, hereby declare that:

    1)    I have personal knowledge of each matter set forth in this Declaration. If called upon to testify to the matters stated in this Declaration, I am competent to do so.

    2)    My husband and I currently occupy our single-family home located at 10009 Anoel Court, Spring Valley CA 91977 (the "Home").

    3)    My Home is my primary residence and is not investor-owned.

EX. A 83

4)      My Home is not vacant or condemned.

5)      The First lien on my Home has an unpaid principal balance of approximately $438,334 according to the sale trustee's website, www.priorityposting.com, which lists the sale information of my Home.

6)      Based on the foregoing, I consider myself qualified for a modification under the Making Home Affordable Plan, effective March 4, 2009.

7)      After a search on www.zillow.com, I determined that my property has a current fair market value of approximately $280,000.  Attached as Exhibit A is a true and correct copy of the www.zillow.com printout following a search of my Home's address.

8)      Our household gross income is $6,900.  Lowering the payment to 31% of that figure would produce a monthly payment of $2,139 for principal and interest. The Net Present Value of that payment spread over 40 years is $747,658.

9)      Wells Fargo offered me a modification of my first loan at an interest rate of 7.125% in March 2009; I did not accept as this offer was of no benefit to me, as I could not make such a payment.

10)      I wish fervently to keep my Home; my husband and I purchased the home to enjoy it after my husband's forthcoming retirement and have lived there for four years and share many fond memories with our grandchildren.


I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.  Executed on June 9, 2009, at Chula Vista, California.


Elizabeth A. Hurrey-Mayer

2
Declaration of Elizabeth A. Hurrey-Mayer

EX. A 84

**EXHIBIT**
**A**

 **Zillow.com**

**10009 Anoel Ct**
Spring Valley CA 91977
3 beds, 2.0 baths, 1,443 sq ft
Zestimate®: $280,000

**My Estimate:**

**Monthly Payment: $ 1,295** edit
Current Rates

**Bird's Eye View**



See a

**Home Info**
**Public Facts:**
- Single family
- 3 beds
- 2.0 bath
- 1,443 sqft
- Lot 11,600 sqft
- Built in 1970

**Neighborhood: 91977**

**Nearby Schools:**

**District:**
--
**Primary:**
    Highlands Elementary ...
**Middle:**
    Spring Valley Middle ...
**High:**
    Monte Vista High ...

    See more 91977 local information
    See more Spring Valley schools

**Charts & Data**

**ZESTIMATE®: $280,000**
Value Range: $221,200 -
$299,600
30-day change: -$4,000
Zestimate updated: 06/05/2009



**Last sale and tax info**

**Sold 06/15/2005:**
    $515,000
**2008 Property Tax:**
    $3,754

EX. A 85

Octavio Cardona-Loya II, Esq. (SBN 255309)
Law Offices of Eric F. Fagan
2300 Boswell Rd. Suite 211
Chula Vista, CA 91914
vito@efaganlaw.com
T: 619-656-6656 / F: 775-898-5471
Attorney for Plaintiff Elizabeth A. Hurrey-Mayer

# SUPERIOR COURT OF CALIFORNIA
## SAN DIEGO COUNTY, CENTRAL DIVISION

| | |
|---|---|
| ELIZABETH A. HURREY-MAYER, an individual,<br><br>       Plaintiff,<br><br>v.<br><br>WELLS FARGO HOME MORTGAGE, INC. d.b.a. AMERICA'S SERVICING COMPANY, a corporation; and DOES 1 through 10 inclusive,<br><br>       Defendants. | Case No.: 37-2009-00090985-CU-OR-CTL<br><br>**Declaration of Octavio Cardona-Loya II in Support of Plaintiff's Ex Parte Application for Temporary Restraining Order and an Order to Show Cause**<br><br>Date: June 11, 2009<br>Time: 8:30 a.m.<br>Dept.: C-65<br><br>The Hon. Joan M. Lewis |

I, Octavio Cardona-Loya II, hereby declare that:

    1)    I have personal knowledge of each matter set forth in this Declaration. If called upon to testify to the matters stated in this Declaration, I am competent to do so.

    2)    I am the attorney of record in the above entitled case and am familiar with the facts of the case and pleadings.

    3)    I submit this declaration pursuant to CRC 3.1202 and 3.1204.

EX. A 86

4)     On June 8, 2009 at approximately 2:30 p.m., I called Defendant's Agent for Service of Process, "CSC - LAWYERS INCORPORATING SERVICE" at 888-690-2882 and spoke to Rose.

5)     I informed Rose the purpose of my call was to give notice regarding the Ex Parte Temporary Restraining Order hearing.

6)     Rose transferred me to Kathryn Grambsch at CSC's Customer Service Department.

7)     Ms. Grambsch stated CSC would accept notice of the Ex Parte Temporary Restraining Order hearing on behalf of Defendant.

8)     I informed Ms. Grambsch of the case name and number in addition to the date, time, department number, and court location for the Ex Parte Temporary Restraining Order hearing.

9)     I am not aware if Defendant will appear at the hearing. The Notice, Application, Memorandum of Points and Authorities, and Declarations will be mailed overnight to CSC's address provided by Ms. Grambsch at 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.

10)    There have been no other ex parte applications filed in this case.

11)    Ex parte relief is necessary to prevent irreparable harm and immediate damage to Plaintiff. Defendants have scheduled a foreclosure sale of Plaintiff's home on June 11, 2009 at 10:00 a.m. The foreclosure is in violation of the rights of Plaintiff and there is not enough time for a noticed motion to be heard. If relief is not granted, Plaintiff will lose her home. Pecuniary compensation would not afford adequate relief for the loss of Plaintiff's Home.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct. Executed on June 8, 2009, at Chula Vista, California.

Octavio Cardona-Loya II

2

Declaration of Octavio Cardona-Loya II

EX. A 87

Octavio Cardona-Loya II, Esq. (SBN 255309)
Law Offices of Eric F. Fagan
2300 Boswell Rd. Suite 211
Chula Vista, CA 91914
vito@efaganlaw.com
T: 619-656-6656 / F: 775-898-5471
Attorney for Plaintiff Elizabeth A. Hurrey-Mayer

# SUPERIOR COURT OF CALIFORNIA
## SAN DIEGO COUNTY, CENTRAL DIVISION

| | |
|---|---|
| ELIZABETH A. HURREY-MAYER, an individual, | ) Case No.: 37-2009-00090985-CU-OR-CTL |
| | ) |
| Plaintiff, | ) **[Proposed] Temporary Restraining** |
| | ) **Order re: Foreclosure** |
| v. | ) |
| | ) Date: June 11, 2009 |
| WELLS FARGO HOME MORTGAGE, INC. | ) Time: 8:30 a.m. |
| d.b.a. AMERICA'S SERVICING | ) Dept.: C-65 |
| COMPANY, a corporation; and DOES 1 | ) |
| through 10 inclusive, | ) The Hon. Joan M. Lewis |
| | ) |
| Defendants. | ) |
| | ) |

The motion of Plaintiff for the issuance of a Temporary Restraining Order came on regularly before hearing on June 11, 2009 in Department C-65 of the above-entitled Court, the Honorable Joan M. Lewis Judge Presiding. The Court, after considering the papers filed in support of Plaintiff's Motion, and the papers of Defendants in opposition to the Motion, and after considering the argument of all counsel hereby GRANTS Plaintiff's Motion for the issuance of a temporary restraining order.

1

[Proposed] Temporary Restraining Order re: Foreclosure

EX. A 88

## TEMPORARY RESTRAINING ORDER

IT IS HEREBY ORDERED that Defendant and their respective agents, employees, representatives, and all persons acting at its discretion, under its control, or in concert or conspiracy with it, including without limitation the foreclosure trustee, are enjoined from engaging in any of the following acts:

1)      Foreclosing on that certain real property located at 10009 Anoel Court, Spring Valley CA 91977 (the "Plaintiff's Home").

2)      Conducting a trustee's sale relative to Plaintiff's Home.

3)      Recording any document with the San Diego County Recorder's Office that is necessary to effectuate a foreclosure or trustee's sale of Plaintiff's Home.

4)      Taking any other act that furthers or aids Defendants' attempts to foreclose on or conduct a trustee's sale of Plaintiff's Home.


DATE: _____          BY: _____

                                    JUDGE OF THE SUPERIOR COURT


PROPOSED BY:

Octavio Cardona-Loya II
Attorney for Plaintiff

EX. A 89

# PROOF OF SERVICE

## Hurrey-Mayer v Wells Fargo Home Mortgage
SDSC Cen. County, Case No. 37-2009-00090985-CU-OR-CTL

I, Dorian Hudson, declare,

I am citizen of the United States and employed in San Diego County, California. I am over

the age of eighteen years and not a party to the within-entitled action. My business address is 2300

Boswell Rd Ste 211, Chula Vista, CA 91914.  On June 9, 2009 I served a copy of the within

document(s):

**Plaintiff's Ex Parte Notice and Application for Temporary Restraining Order
and An Order to Show Cause Re: a Preliminary Injunction; Memorandum of
Points and Authorities, Declaration of Elizabeth A. Hurrey-Mayer in Support
of Her Ex Parte Application for Temporary Restraining Order and an Order to
Show Cause, Declaration of Octavio Cardona-Loya II in Support of Plaintiff's
Ex Parte Application for Temporary Restraining Order and an Order to Show
Cause, [Proposed] Temporary Restraining Order re: Foreclosure**

☑ **By United States mail.** I enclosed the documents in a sealed envelope to the persons
at the address listed below:

☑ Placed the envelope for collection and mailing, following our ordinary
business practices. I am readily familiar with this business's practice for
collecting and processing correspondence for mailing. On the same day that
correspondence is placed for collection and mailing, it is deposited in the
ordinary course of business with the United States Postal Service, in a sealed
envelope with postage fully prepared.

I am resident or employed in the county where the mailing occurred. The envelope
or package was placed in the mail at Chula Vista, California.

EX. A 90

☑ **By overnight delivery**. I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the address listed below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE
C/O Wells Fargo Home Mortgage, Inc d.b.a. America's Servicing Company
2730 GATEWAY OAKS DR STE 100
SACRAMENTO, CA 95833

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 9, 2009, at Chula Vista, California.

Dorian Hudson

PROOF OF SERVICE

EX. A 91



EXTREMELY URGENT   Please Rush To Addressee

PLEASE PRESS FIRMLY

# EXPRESS MAIL
UNITED STATES POSTAL SERVICE

## Flat Rate
## Mailing Envelope
### For Domestic and International Use

Schedule package pickup right from your home or office at usps.com/pickup

Print postage online - Go to usps.com/postageonline

PLEASE PRESS FIRMLY

U.S. POSTAGE
$17.50
EXP FR ENV
91914
08/08/09
02 1P00

Addressee Copy

Post Office To Addressee

DELIVERY (POSTAL USE ONLY)

CUSTOMER USE ONLY

When used internationally affix customs declarations (PS Form 2976, or 2976A).

FOR PICKUP OR TRACKING
Visit www.usps.com
Call 1-800-222-1811

PRESS HARD. YOU ARE MAKING 3 COPIES.

EX. A 92

Octavio Cardona-Loya II, Esq. (SBN 255309)
Law Offices of Eric F. Fagan
2300 Boswell Rd. Suite 211
Chula Vista, CA 91914
vito@efaganlaw.com
T: 619-656-6656 / F: 775-898-5471
Attorney for Plaintiff Elizabeth A. Hurrey-Mayer

F I L E D
Clerk of the Superior Court

JUN 11 2009

By: S. KLAIS, Deputy

# SUPERIOR COURT OF CALIFORNIA
## SAN DIEGO COUNTY, CENTRAL DIVISION

ELIZABETH A. HURREY-MAYER, an individual,

       Plaintiff,

v.

WELLS FARGO HOME MORTGAGE, INC. d.b.a. AMERICA'S SERVICING COMPANY, a corporation; and DOES 1 through 10 inclusive,

       Defendants.

) Case No.: 37-2009-00090985-CU-OR-
) CTL
)
) [Proposed] **Temporary Restraining**
) **Order re: Foreclosure**
)
) Date: June 11, 2009
) Time: 8:30 a.m.
) Dept.: C-65
)
) The Hon. Joan M. Lewis
)
)
)
)

    The motion of Plaintiff for the issuance of a Temporary Restraining Order came on regularly before hearing on June 11, 2009 in Department C-65 of the above-entitled Court, the Honorable Joan M. Lewis Judge Presiding. The Court, after considering the papers filed in support of Plaintiff's Motion, and the papers of Defendants in opposition to the Motion, and after considering the argument of all counsel hereby GRANTS Plaintiff's Motion for the issuance of a temporary restraining order.

EX. A 93

## TEMPORARY RESTRAINING ORDER

1      IT IS HEREBY ORDERED that Defendant and their respective agents, employees,

2  representatives, and all persons acting at its discretion, under its control, or in concert or

3  conspiracy with it, including without limitation the foreclosure trustee, are enjoined from

4  engaging in any of the following acts:

5      1)    Foreclosing on that certain real property located at 10009 Anoel Court, Spring

6  Valley CA 91977 (the "Plaintiff's Home").

7      2)    Conducting a trustee's sale relative to Plaintiff's Home.

8      3)    Recording any document with the San Diego County Recorder's Office that is

9  necessary to effectuate a foreclosure or trustee's sale of Plaintiff's Home.

10      4)    Taking any other act that furthers or aids Defendants' attempts to foreclose on

11  or conduct a trustee's sale of Plaintiff's Home.

DATE: 6-1-09

BY: _____

**JOAN M. LEWIS**

JUDGE OF THE SUPERIOR COURT

PROPOSED BY:

Octavio Cardona-Loya II
Attorney for Plaintiff

2
[Proposed] Temporary Restraining Order re: Foreclosure

EX. A 94

## PROOF OF SERVICE

<u>Hurrey-Mayer v Wells Fargo Home Mortgage</u>
SDSC Cen. County, Case No. 37-2009-00090985-CU-OR-CTL

I, Dorian Hudson, declare,

I am citizen of the United States and employed in San Diego County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2300 Boswell Rd Ste 211, Chula Vista, CA 91914.  On June 11, 2009 I served a copy of the within document(s):

### Temporary Restraining Order re: Foreclosure

O **By United States mail.** I enclosed the documents in a sealed envelope to the persons at the address listed below:

O Placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepared.

I am resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Chula Vista, California.

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE
C/O Wells Fargo Home Mortgage, Inc d.b.a. America's Servicing Company
2730 GATEWAY OAKS DR STE 100
SACRAMENTO, CA 95833

EX. A 95

1       I declare under penalty of perjury under the laws of the State of California that the above is

2   true and correct.

3       Executed on June 11, 2009, at Chula Vista, California.

4

5                                   Dorian Hudson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

EX. A 96





082S0005586284

$0.440
US POSTAGE
FIRST-CLASS
FROM 91915
JUN 11 2009
stamps.com

LAW OFFICES OF ERIC F. FAGAN
2300 BOSWELL RD, SUITE 211
CHULA VISTA, CA 91914

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN
CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE
C/O Wells Fargo Home Mortgage, Inc d.b.a. America's Servicing Company
Ent
2730 Gateway Oaks Dr Ste 100
SACRAMENTO CA 95833-3503

JS 44 (Rev. 12/07)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
ELIZABETH A. HURREY-MAYER

### DEFENDANTS
WELLS FARGO HOME MORTGAGE, INC. dba AMERICA'S SERVICING COMPANY

**(b)** County of Residence of First Listed Plaintiff  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Des Moines, Iowa
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Octavio Cardona-Loya, II, Esq.
Law Offices of Eric F. Fagen
2300 Boswell Road, Suite 211
Chula Vista, CA 91914
Telephone: (619) 656-6656

Attorneys (If Known)
Edward D. Vogel, Esq., Cal. Bar. No. 11008
Mark G. Rackers, Esq., Cal. Bar No. 254242
Sheppard, Mullin, Richter & Hampton LLP
501 West Broadway, Suite 190
San Diego, CA 92101
Telephone: (619) 338-6500

'09 CV 1470 DMS NLS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury—Med. Malpractice<br>☐ 365 Personal Injury—Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | ☒ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities—Employment<br>☐ 446 Amer. w/Disabilities—Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| | | **IMMIGRATION** | **SOCIAL SECURITY** | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| | | ☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus—Alien Detainee<br>☐ 465 Other Immigration Actions | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |

### V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1  Original Proceeding
- ☒ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC sections 1441, 1446 and 1331

Brief description of cause:
Plaintiff filed a complaint alleging violations of the Fair Credit Reporting Act and other claims.

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
July 7, 2009

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #  002776   AMOUNT  $350   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

ORIGINAL
www.FormsWorkflow.com

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS002776
Cashier ID: bhartman
Transaction Date: 07/07/2009
Payer Name: AMERICAN MESSENGER SERVICE
-----------------------------------
CIVIL FILING FEE
 For: HURREY-MAYER V WELLS FARGO
 Case/Party: D-CAS-3-09-CV-001470-001
 Amount:         $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 1199
 Amt Tendered:  $350.00
-----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```